# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

No. 16-10192

October 25, 2016

Lyle W. Cayce
Clerk

DANNY FEWINS, Individually and as Next Friend for DAF, a Minor;
MELISSA FEWINS, Individually and as Next Friend for DAF, a Minor,

Plaintiffs - Appellants

v.

GRANBURY HOSPITAL CORPORATION, doing business as Lake Granbury
Medical Center; SCOTT JONES, M.D.; QUESTCARE MEDICAL SERVICES,
PROFESSIONAL ASSOCIATION,

Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:14-CV-898

Before BENAVIDES, HAYNES, and GRAVES, Circuit Judges.

PER CURIAM:*

This is an appeal from an order granting summary judgment for
the Appellee, Lake Granbury Medical Center ("LGMC"). Appellants
Danny Fewins and Melissa Fewins, individually and as Next Friend for
their minor son, ("D.A.F."), brought this suit against LGMC for violations

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH
CIR. R. 47.5.4.

No. 16-10192

of the Emergency Medical Treatment and Active Labor Act ("EMTALA") arising from LGMC's treatment of D.A.F. on June 29, 2012. Because Appellants have not raised a material issue of fact with respect to any of their claims brought pursuant to EMTALA, we AFFIRM the district court's grant of summary judgment in favor of LGMC.

## I.    FACTUAL AND PROCEDURAL HISTORY

On June 22, 2012, while playing at a local park, D.A.F. was climbing a tree and fell approximately three feet. Although he seemed fine at first with only a small cut and bruise on his leg, several days later he began running a fever and complaining of pain in both legs. As a result, on June 27, his mother took him to Glen Rose Medical Center ("GRMC") in Glen Rose, Texas. The Fewins did not have health insurance. His mother told the staff that he had fallen on June 22 and that he now complained of pain when his legs were touched or he moved or put weight on them. The nursing staff measured D.A.F.'s vital signs: blood pressure 115/86, heart rate of 110, respiratory rate of 16, and temperature of 99.9. The staff noted that D.A.F. had been crying and that he had limited range of motion in his hips and thighs, which were sensitive to palpation. D.A.F. reported his pain as rating a ten on the pain rating scale of ten and was given Tylenol with codeine for pain relief. X-rays of his femur and hip were ordered. The chart described the results of the x-rays as normal. D.A.F. was discharged from the hospital with a diagnosis of acute pain in his right lower extremity.

The next day, June 28, 2012, D.A.F. stayed home with his father and seemed to fare better. That night, he began to run a fever and complained of increasing pain in his hips. D.A.F. did not want to move.

2

No. 16-10192

During the early morning of June 29, Mrs. Fewins took D.A.F. to LGMC. At LGMC's emergency room, his vital signs were as follows:  a temperature of 97.6; pulse rate of 125; respiratory rate of 22; and 10 out of 10 on the pain scale.  Mrs. Fewins informed the emergency room staff that two days ago she had taken her son to the emergency room at the GRMC.    Dr. Scott Jones, a board-certified emergency physician performed a physical examination of D.A.F., which revealed moderate tenderness in the left lower extremity.  Dr. Jones ordered blood and urine testing and a CT of the child's lower extremities and pelvis.  The CT was read as having sub-acute subcutaneous contusions and a small intramuscular sub-acute hematoma.  The blood tests results were a white blood cell count of 14.7, with presence of 81% neutrophils and 12% bands. According to the Fewins' expert, Dr. Carlson, the blood test results reveal an abnormally elevated white blood cell count and were highly suggestive of a bacterial infection.  Dr. Jones later testified at his deposition that although the tests were "outside the lab's reference range," his opinion was that there were no "clinically significant abnormalities."  Dr. Jones did not consider the results elevated or abnormal in a six-year old.

Dr. Jones's notes provided that there was no evidence of anything other than a contusion/hematoma and that a muscle strain was suspected. Dr. Jones thought it seemed like the patient cried and complained of pain more when his mother was present.  Mrs. Fewins stated to Dr. Jones that her son sometimes plays up his injuries to her. Dr. Jones believed that although D.A.F. was in pain, he was exaggerating his symptoms.  Dr. Jones did not see any evidence of serious etiology and did not think the contusion/hematoma/strain constituted a serious threat

3

No. 16-10192

to D.A.F.'s life or a limb-threatening condition. Dr. Jones consulted with a radiologist and diagnosed a contusion on each hip and acute pain in his right lower extremity. Dr. Jones noted the patient's condition was stable and discharged D.A.F. The mother was instructed to continue to administer Tylenol with codeine and to follow up D.A.F.'s care with his pediatrician on Monday. At discharge, D.A.F. refused to walk because of the pain.

Early the next morning on June 30, the Fewins took their son to the emergency room at Cook Children's Medical Center ("Cook Children's"). His temperature was 103.6, pulse 166, respirations of 32 and pain reported as 6 out of 10. He was noted to have swelling and exquisite tenderness in his left femur upon palpitation. There was a decrease in white blood count indicating infection. He was admitted to the hospital and began receiving antibiotics for infection and morphine for pain. The diagnosis at the time of admission was myositis, fever and limp. He was hospitalized from June 30 to August 10, and underwent several surgeries and was treated for a Methicillin-resistant Staphylococcus aureus ("MRSA") infection. As a result, he has permanent bone damage and is at risk for future infection and injuries.

On March 11, 2014, David and Melissa Fewins, individually and as Next Friend for D.A.F., brought the instant suit against LGMC for violations of the EMTALA arising from LGMC's treatment of D.A.F. on June 29, 2012.[1] In addition, the Fewins brought a malpractice claim,

---

[1] In the same action, the Fewins also named Dr. Jones and Questcare Medical Services as defendants. However, the district court severed the claims against LGMC from the other defendants, creating two separate actions. *Vander Zee v. Reno,* 73 F.3d 1365, 1368 n.5 (5th

4

No. 16-10192

alleging that LGMC was negligent with respect to the care and treatment provided to D.A.F. On May 9, 2014, LGMC filed a motion to dismiss for failure to state a claim. On January 13, 2015, the district court denied the motion to dismiss. On May 1, LGMC filed a motion for summary judgment. Two weeks later, the Fewins filed a motion for partial summary judgment. Subsequently, on May 21, LGMC filed a motion to strike the opinions of the Fewins's expert witness, Dr. Carlson.

On August 7, the district court held a hearing on the motions for summary judgment, partial summary judgment, and to exclude the opinions of Dr. Carlson. At the conclusion of the hearing, the district court orally granted LGMC's motion for summary judgment, concluding that there was an adequate medical screening evaluation conducted by Dr. Jones and thus, there was no EMTALA violation. The court also concluded that Dr. Carlson's expert testimony was "not the product of reliable principles and methods and that he did not reasonably apply the principles and methods, had those been reliable, to the facts of the case." Thus, the court ruled that Dr. Carlson's testimony was not admissible under Federal Rule of Evidence 702. The court also found that there was "no evidence that the nurses engaged in any willful and wanton negligence that would support a claim against [LGMC]."

On January 25, 2016, the court issued a memorandum opinion and order granting LGMC's motion for summary judgment and denying the

---

Cir. 1996). Thus, although the district court entered final judgment with respect to the claims against LGMC, as set forth at II.D. *infra,* we do not have appellate jurisdiction over the order granting Dr. Jones and Questcare Medical Services's motion to exclude the expert witness's testimony.

No. 16-10192

Fewins's motion for partial summary judgment.  Subsequently, the district court entered final judgment, and the Fewins timely appealed.

II.    ANALYSIS

A. Standard of Review

This Court reviews a "grant of summary judgment de novo, applying the same standard as the district court." *QBE Ins. Corp. v. Brown & Mitchell, Inc.*, 591 F.3d 439, 442 (5th Cir. 2009). The moving party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

B.    EMTALA Claim

The Fewins contend that the district court erred in granting summary judgment in favor of LGMC, arguing that there are genuine issues of material fact with respect to their EMTALA claim.  The statute requires that a hospital provide the following care to a person seeking emergency medical treatment:  "(1) an appropriate medical screening, (2) stabilization of a known emergency medical condition, and (3) restrictions on transfer of an unstabilized individual to another medical facility." *Battle v. Mem. Hosp. at Gulfport*, 228 F.3d 544, 557 (5th Cir. 2000) (citing 42 U.S.C. § 1395dd(a)-(c)).

However, Congress did not intend the EMTALA to be utilized as a federal malpractice statute. *Marshall v. East Carroll Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998).  Instead, it "was enacted to prevent 'patient dumping,' which is the practice of refusing to treat patients who are unable to pay." *Id.* (citations omitted).  As such, "an EMTALA 'appropriate medical screening examination' is not judged by

6

its proficiency in accurately diagnosing the patient's illness, but rather by whether it was performed equitably in comparison to other patients with similar symptoms." *Id.* Thus, if the patient is "provided an appropriate medical screening examination," the hospital "is not liable under EMTALA even if the physician who performed the examination made a misdiagnosis that could subject him and his employer to liability in a medical malpractice action brought under state law." *Id.*

To survive a motion for summary judgment, a plaintiff must submit evidence demonstrating a material fact issue with respect to whether the hospital afforded an appropriate medical screening examination under EMTALA. *Id.* at 323. The statute itself does not define the parameters of an appropriate examination. *Id.* An appropriate examination is one that the hospital would have provided "to any other patient in a similar condition with similar symptoms." *Id.* The plaintiff has the burden of demonstrating that the hospital failed to provide an appropriate examination under EMTALA. *Id.* at 323–24. The plaintiff may carry this burden by demonstrating that either: (1) the hospital failed to follow its own standard screening procedures; or (2) there were "differences between the screening examination that the patient received and examinations that other patients with similar symptoms received at the same hospital"; or (3) the hospital offered "such a cursory screening that it amounted to no screening at all." *Guzman v. Memorial Hermann Hosp. Sys.*, 409 F. App'x 769, 773 (5th Cir. 2011).

1.     Cursory Screening

The Fewins contend that Dr. Jones's screening of D.A.F. was so cursory that it did not amount to a screening. In support of that

contention, the Fewins point to Mrs. Fewins's deposition testimony that although she knew something was wrong with D.A.F., Dr. Jones did not want to listen to her. The Fewins assert that Mrs. Fewins's testimony must be believed for the purposes of summary judgment analysis, and thus, her testimony raises a fact issue as to whether the screening was so cursory that it amounted to no screening. While it is correct that we must view the evidence in the light most favorable to the nonmoving party, *Am. Home Assurance Co. v. United Space Alliance, LLC,* 378 F.3d 482, 486 (5th Cir. 2004), there is undisputed evidence that demonstrates that the screening was not cursory.

D.A.F. arrived at LGMC's emergency room at 5:48 a.m. Within six minutes, he was in triage and the nurse took his vital signs. At 6:02, Dr. Jones began evaluating him and took a history from him and his mother. The medical records show that Dr. Jones reviewed the nurse's documentation and then performed a physical examination of D.A.F. Dr. Jones then ordered several lab tests, including blood tests and a urinalysis. Dr. Jones also ordered a CT scan of the lower extremities and pelvis. In addition to receiving the report about the CT scan from Nighthawk Radiology Services, Dr. Jones called LGMC's staff radiologist to consult with him. The records also note that Dr. Jones reviewed all lab results and concluded there were no "clinically significant abnormalities."

The only case relied upon by the Fewins to show that the screening was cursory is a First Circuit opinion. *Correa v. Hosp. S.F.*, 69 F.3d 1184 (1st Cir. 1995). In *Correa*, the patient was a 65-year old woman who presented to the emergency room feeling nauseous and having chest

pains. *Id.* at 1188. Although the patient waited at least two hours, she received no treatment or screening and finally gave up and went to another facility and passed away shortly thereafter. *Id.* at 1189. Under those circumstances, the First Circuit held that the jury's finding that the hospital denied the plaintiff an appropriate screening examination "unimpugnable." *Id.* at 1193. *Correa* is inapposite. Here, D.A.F. was triaged almost immediately and then examined by Dr. Jones, who ordered a CT and lab tests. After reviewing the results of the lab tests and consulting a radiologist, Dr. Jones concluded D.A.F. had a hematoma and discharged him. In light of the undisputed evidence in the record, the Fewins's contention that the screening was so cursory that it did not constitute a screening is meritless.

### 2.    Failure to Follow Procedure

To show that LGMC did not follow its own screening procedure, the Fewins contend that LGMC violated its pain management policy in screening D.A.F. The Fewins point to the testimony of Ann Quinlan, the LGMC Corporate Representative, as proof that the pain management policy was violated. The Fewins assert that Quinlan's testimony demonstrates that the nurses were expected to follow LGMC's pain management policy. Quinlan's testimony does demonstrate that the nurses at LGMC were expected to follow the "hospital-wide nursing policy on pain assessment." The Fewins also contend that Quinlan admitted that the nurses failed to follow the policy's required assessments. Contrary to the Fewins's contention, Quinlan testified that the nurse who saw D.A.F. "did follow" the policy on pain management.

The Fewins further contend that the nurses were expected to follow the pain management policy as part of the medical screening examination. This contention is incorrect. During the deposition, the Fewins's attorney asked Quinlan whether there are "any medical screening examination protocols that apply to nursing staff in the emergency department." Quinlan responded as follows: "No. The medical screening exam is always done by a physician or a licensed independent practitioner." Additionally, Quinlan specifically testified that nurse practitioners or physician's assistants did not perform EMTALA medical screening examinations at LGMC. Quinlan testified that although the nurse practitioner may gather the information, a physician sees all the patients for purposes of the EMTALA medical screening. This Court has explained that if a triage assessment is preliminary to and not part of the medical screening examination, then whether the triage violated the hospital's policy is not material to the EMTALA claim. *Stiles v. Tenet Hosp., Ltd.*, 494 F. App'x 432, 436 (5th Cir. 2012). Accordingly, even assuming that the Fewins could demonstrate that the nurses violated the pain management policy in assessing D.A.F., because their assessment was not part of the medical screening examination, any such violation would not be material to the Fewins's EMTALA claim.

Indeed, Dr. Carlson's own testimony makes clear that the pain management policy was not part of the emergency medical screening examination pursuant to EMTALA. Dr. Carlson testified that "LGMC had no standard emergency medical screening examination protocol" and that the "general screening policy delegated the medical screening

examination to the emergency room doctor, who was allowed to use his or her individual judgment on each individual patient in determining whether the screening examination was adequate." Dr. Carlson also testified that Dr. Jones "had enough information based on the history, physical exam, the CBC and CT to say that a soft tissue infection was the most serious diagnosis and most likely diagnosis." Thus, Dr. Carlson's testimony demonstrates that Dr. Jones obtained adequate information from his screening examination to make the correct (or at least most likely) diagnosis. As LGMC contends, boiled down, Dr. Carlson's criticism is that Dr. Jones failed to diagnose the infection in D.A.F. This argument does not implicate an EMTALA claim. *See Marshall,* 134 F.3d at 322 (explaining that if a patient is "provided an appropriate medical screening examination," a hospital "is not liable under EMTALA even if the physician who performed the examination made a misdiagnosis that could subject him and his employer to liability in a medical malpractice action brought under state law"). In sum, the Fewins have not shown that the alleged violation of the pain management policy created a fact issue with respect to their EMTALA screening examination claim.

### 3.    Disparate Screenings of Similar Symptoms

The Fewins next contend that D.A.F. was screened disparately compared with three other patients who had similar symptoms. To obtain a pool of patients who had similar symptoms, the Fewins's expert, Dr. Carlson, identified the relevant symptoms and the associated medical codes and requested medical records from LGMC that matched his request. In response, LGMC provided the medical records of three patients.

No. 16-10192

The first patient was an 81-year old male who arrived at LGMC complaining of lower leg pain. He ranked his pain as 1 out of 10 and his white blood cell count was elevated. He was taking penicillin for his cellulitis. The second patient was a 58-year old male who was obese and complained of hip pain. His white blood cell count was elevated. He had a history of asthma, congestive heart failure, hypertension, diabetes, renal failure and atrial fibrillation. He was taking numerous prescription medications for these health conditions. The third patient was a 79-year old female with dementia who had a sudden onset of weakness and pain in her knee. Her white blood cell count was elevated. She was wearing a prosthesis and previously had surgery on her knee.

Unlike D.A.F., all three patients were admitted to the hospital. The Fewins's expert witness, Dr. Carlson, testified that in his opinion D.A.F. was treated disparately from the other three patients. However, as the district court explained, EMTALA does not apply unless patients who are perceived to have the same medical condition receive disparate treatment. *Marshall*, 134 F.3d at 323 (citing *Vickers v. Nash General Hosp., Inc.*, 78 F.3d 139, 144 (4th Cir. 1996)). D.A.F. was a child who appeared healthy prior to falling from the tree. Dr. Jones perceived D.A.F.'s pain to be caused by the contusion or hematoma that resulted from the fall. The comparators were much older than D.A.F. with medical histories unlike D.A.F.'s history. Thus, although the other patients may have had similar symptoms, they do not appear to have been "in a similar condition" to D.A.F. *Id.* at 323. Moreover, the physicians evaluating those three patients perceived that each patient was possibly suffering from an infection. The medical records

demonstrate that Dr. Jones did not perceive D.A.F. to have an infection. Indeed, at the hearing before the district court, D.A.F.'s counsel admitted that Dr. Jones "didn't perceive it to be an emergency."[2]  Accordingly, because the Fewins have not provided competent evidence showing that D.A.F. was perceived to have the same medical condition as the other patients, they cannot demonstrate that D.A.F. received disparate screening.  *Marshall,* 134 F.3d at 323 (citing *inter alia Vickers*, 78 F.3d at 144).

### 4.    Stabilization

The Fewins also contend that D.A.F. was not stabilized prior to his discharge in violation of EMTALA.  A hospital's duty to stabilize does not arise unless it has actual knowledge of the patient's unstabilized emergency medical condition.  *Marshall*, 134 F.3d at 325.  To prevail on this issue, the Fewins "must identify evidence from which a jury could conclude that [LGMC] had actual knowledge that [D.A.F.] had an emergency medical condition and, if so, that he was not stabilized prior to the discharge." *Battle*, 228 F.3d at 559.

As previously noted at footnote 2 *supra,* at the hearing before the district court, D.A.F.'s counsel admitted that the only record evidence to show that Dr. Jones perceived D.A.F. to have an "emergency medical condition"[3] was Dr. Jones's checking the box on the form indicating that

---

[2] After admitting that Dr. Jones did not perceive D.A.F. as having an "emergency condition," counsel stated that Dr. Jones did check the box on the form for a "certified medical emergency."  As explained in Section II.B.2., *infra*, Dr. Jones's checking the box does not raise a material issue of fact with respect to whether Dr. Jones thought D.A.F. had an "emergency medical condition."

[3] 42 U.S.C. § 1395dd(c); *Battle*, 228 F.3d at 558.

there was a "certified medical emergency." Therefore, to demonstrate that D.A.F. had an "emergency medical condition," the Fewins rely on Dr. Jones's notation in the medical record that "Patient's condition represents a *certified medical emergency*. Disposition date/time: 06/29/2012 08:24." (emphasis added). At the hearing, the district court ruled that documenting a "certified medical emergency" is not the same as finding an "emergency medical condition." The court held "as a matter of law, from the undisputed facts, that Dr. Jones did not find an emergency medical condition. [I]t is the position of the plaintiffs that there was one and he should have found it, but it's clear that he did not find one." The court further held that although Dr. Jones administered an adequate and appropriate medical screening evaluation, he did not find that D.A.F. had an emergency medical condition.

During his deposition, Dr. Jones testified that his notation of a "certified medical emergency" did not mean that D.A.F. had an "emergency medical condition." He testified that those two terms are "very different." He explained that when a patient presents in the emergency room with a "certified medical emergency," the physician does not know whether they have an "emergency medical condition." Once a patient is in the emergency room and presents with a "condition which could potentially be a serious emergent condition, . . . we are instructed to document that they have a certified medical emergency." If the physician finds a certified medical emergency, the physician is "obligated to investigate it, to do a medical screening exam, to investigate what the extent of the injury or illness is." He further explained that unless it is documented that a person has a certified medical emergency, there is "no

testing or work up or assessment" of the patient. Dr. Jones understood that a certified medical emergency must be documented for a third-party payor to cover the emergency room visit. Nonetheless, if a "patient still requests the evaluation," he would then perform it. Dr. Jones testified that the physicians documented that "virtually every patient who came in the door" had a certified medical emergency unless the patient had a trivial complaint such as a hangnail.

The medical record shows that D.A.F.'s vital signs had improved by the time of discharge and that Dr. Jones did not believe that the lab test results were clinically abnormal. D.A.F.'s reported pain level had decreased to a zero at the time of discharge. Dr. Jones concluded that D.A.F. was medically stable and discharged him. Dr. Jones testified that after he conducted the medical screening exam of D.A.F., he concluded that D.A.F. did not have an emergency medical condition.

Although we must view the evidence in the light most favorable to the Fewins, there is no evidence that raises a fact issue with respect to Dr. Jones's opinion that D.A.F. did not have an emergency medical condition despite his documenting D.A.F. as having a "certified medical emergency." The evidence demonstrates that Dr. Jones, whose knowledge is imputed to LGMC, did not perceive or have actual knowledge that D.A.F. had an emergency medical condition. Thus, the Fewins have not shown that the district court erred in granting summary judgment to LGMC on the stabilization claim. *Battle*, 228 F.3d at 559.

### C. Negligence/Malpractice Theory

The Fewins contend that fact issues preclude summary judgment on their claim of negligence/malpractice against LGMC. During the

hearing before the district court, Fewins's counsel specifically stated that: "Setting aside the EMTALA issue, there are no negligence allegations against the hospital." *Id.*[4] The Fewins therefore abandoned any negligence claims they had against LGMC. Further, even if this claim had not been abandoned below, the argument with respect to this issue on appeal is abandoned by the inadequate briefing. *See e.g., Young v. Repine (In re Repine)*, 536 F.3d 512, 518 n.5 (5th Cir. 2008); *see also* Fed. R. App. P. 28(a)(8) (requiring citation to authorities).

### D. Exclusion of Expert Witness Testimony

Finally, the Fewins contend that the district court erred in granting LGMC's motion to exclude the testimony of their expert witness, Dr. Carlson, whose opinion criticized Dr. Jones's medical treatment of D.A.F. As set forth above, even considering Dr. Carlson's opinion testimony, we conclude that the district court properly granted summary judgment with respect to the EMTALA claims against LGMC. Thus, we find it unnecessary to reach this issue in disposing of the Fewins's appeal from the district court's final judgment in favor of LGMC.

The Fewins also filed a notice of appeal from a separate order issued on February 18, 2016, in which the district court granted Dr. Jones and Questcare's motion to exclude Dr. Carlson's testimony. However, this is an interlocutory order, and the district court did not certify it pursuant to Federal Rule of Civil Procedure 54(b), nor did the court enter a final

---

[4] Additionally, the Fewins's counsel stated that his complaints against the nurses only relate to the EMTALA claims.

judgment with respect to these two defendants.[5] Additionally, the appeal of this non-final order is neither inextricably intertwined with LGMC's appeal nor is it necessary to ensure meaningful review of LGMC's appeal. We therefore do not have pendent appellate jurisdiction of the district court's order. *See Thornton v. General Motors Corp.*, 136 F.3d 450, 453 (5th Cir. 1998) (explaining that pendent appellate jurisdiction should only be found "proper in rare and unique circumstances where a final appealable order is inextricably intertwined with an unappealable order or where review of the unappealable order is necessary to ensure meaningful review of the appealable order") (internal quotation marks and citations omitted). Accordingly, we dismiss for lack of jurisdiction the appeal from the February 18, 2016 order granting the motion to exclude Dr. Carlson's opinion testimony.

III.   CONCLUSION

For the aforementioned reasons, we AFFIRM the district court's grant of summary judgment in favor of LGMC. We DISMISS for lack of jurisdiction the appeal from the February 18, 2016 order granting Dr. Jones and Questcare's motion to exclude Dr. Carlson's opinion testimony.

---

[5] The summary judgment in favor of LGMC was final and appealable. The district court had issued an order severing and staying the claims against Dr. Jones and Questcare. When the district court severed the claims against these two defendants, it created two separate actions. *Vander Zee v. Reno,* 73 F.3d 1365, 1368 n.5 (5th Cir. 1996). The district court then entered a judgment dismissing all of the claims against LGMC that are now before this Court on appeal. Accordingly "no Rule 54(b) certification was required to render the judgment final and appealable." *Id.* (citing *United States v. O'Neil,* 709 F.2d 361, 368–69 (5th Cir. 1983)).