**Randy KILROY, as Personal Representative of Emily Kilroy, Deceased, and on behalf of the Estate of Emily Kilroy, Deceased, and Randy and Debra Kilroy, Individually, Plaintiffs,**

v.

**STAR VALLEY MEDICAL CENTER; Allen D. Carter, M.D.; Does I–X, Inclusive; and Doe Corporations I–V, Inclusive, Defendants.**

**No. 02–CV–1015–B.**

United States District Court,
D. Wyoming.

Dec. 18, 2002.

Robert M. Shively, Amy Marguerite Taheri, Shively Taheri & Rochelle, Casper, WY, for Plaintiffs.

Scott E. Ortiz, Williams, Porter, Day & Neville, Casper, WY, for Defendant.

## ORDER GRANTING DEFENDANT STAR VALLEY MEDICAL CENTER'S MOTION FOR PARTIAL SUMMARY JUDGMENT

BRIMMER, District Judge.

This wrongful death action arises out of the tragic death of a three-year-old girl after she was discharged from the hospital emergency room. The case is before the Court on Defendant Star Valley Medical Center's Motion for Partial Summary Judgment on Plaintiffs' Emergency Medical Treatment and Active Labor Act claims. Upon reading the briefs, hearing oral argument, and being fully advised of the premises, the Court **FINDS** and **ORDERS** as follows:

### *Statement of Parties and Jurisdiction*

Plaintiffs include the Estate of Emily Kilroy and the family of Emily Kilroy: Randy Kilroy, Emily's father; Debra Jensen, Emily's mother; and Levi, Jacob, and Amber Kilroy, Emily's siblings. Plaintiff Randy Kilroy is a resident of Lincoln County, Wyoming and is the Personal Representative of the Estate of Emily Kilroy.

Defendant Star Valley Medical Center ("Star Valley") is a hospital located and conducting business in Afton, Wyoming. The parties agree that Star Valley is subject to the provisions of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd.

Defendant Dr. Allen Carter is a physician licensed to practice medicine in the state of Wyoming.

Defendants Does I–V[1] as alleged by Plaintiff are individuals conducting business in the state of Wyoming who are licensed health care providers and who participated in rendering care to Emily Kilroy and whose true names are not known.

Defendant Doe Corporations I–V as alleged by Plaintiff are corporations which conduct business in the state of Wyoming, whose true names are not known. Plaintiffs contend that Dr. Carter acted as the agent or employee of such Defendants in rendering care to Emily Kilroy, rendering them vicariously responsible and liable for the conduct of Dr. Carter as alleged herein.

The Court has jurisdiction pursuant to 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b).

### *Background*

On March 18, 2001, Emily Kilroy's father, Randy Kilroy, brought Emily to Star Valley's emergency room after a few days of Emily's demonstrating cold-like or flu-like symptoms.

After her arrival to the emergency room, Emily was initially evaluated by Shelli Berry, a registered nurse who was on duty in the emergency room at the

---

1. Although the caption names Does I–X, Plaintiffs' Complaint discusses only Does I–V.

time. Upon completing her initial assessment, Ms. Berry deferred the task of taking and recording Emily's vital signs to Tod Ponciano, a certified nurse assistant. The initial Registered Nurse Assessment recorded Emily's respiratory rate at 56 breaths per minute, above the 20–breath–per–minute average for a child her age. Emily's heart rate was recorded at 146 beats per minute. Her vital signs were not recorded at any time after her initial examination.

Thereafter, Ms. Berry called Dr. Allen Carter, the on-call physician for the emergency room. Over the telephone, Ms. Berry reported to Dr. Carter that a young female with respiratory complaints was in the emergency room, and that although she did not look too sick, Dr. Carter should still evaluate her condition. Nurse Berry mentioned that Emily had nasal flaring, and Dr. Carter gave Berry a verbal order to start an Albuterol nebulizer breathing treatment. Dr. Carter came to the hospital as soon as he was notified and performed an examination.

When Emily presented to the emergency room, her symptoms included difficulty breathing, fever, increased pulse rate, increased respirations, decreased oxygen saturation levels, coughing, and nasal flaring. Dr. Carter believed that part of her breathing difficulty stemmed from some type of spasm or inflammation in her airway. According to Dr. Carter, this would explain why, after she was provided with Albuterol nebulizer, her oxygen saturation levels rose from 87% to 94%.

Dr. Carter examined Emily's ears, throat, head, and neck; additionally, he listened to her breathing and checked her mucus membranes to determine if she was adequately hydrated. The examination lasted approximately thirty minutes. During his examination and treatment of Emily, Dr. Carter observed that Emily's respiratory rate had somewhat slowed.

After his examination, Dr. Carter made two diagnoses: lower respiratory tract infection and ear infection. He also made differential diagnoses that Emily may have had either bronchiliatis, viral pneumonia, or bacterial pneumonia. Although he could not determine which it was, he claims that his treatment plan would not have changed. Dr. Carter prescribed an antibiotic, "Ceclor," for the likely infection, in addition to Tylenol with codeine. He also prescribed three-quarters of a teaspoonful of Albuterol every eight hours until her cough subsided.

Dr. Carter discharged Emily with instructions for her father to monitor her respiratory rate and bring her back in if her condition deteriorated. Randy Kilroy recalled being in the emergency room for about one hour. Although Dr. Carter maintained that Emily's respiratory rate was below 56 breaths per minute when she left the emergency room, Emily's records lacked any documentation of her respiratory rate or other vital signs upon discharge. The records also lacked notes regarding her specific condition upon discharge. When Randy and Emily Kilroy left the emergency room, Randy believed that Emily was breathing easier and that her condition had improved in some respects.

The following morning, Randy Kilroy awoke to find that Emily had died in her sleep. The Kilroy family filed this wrongful death action against Defendants asserting, among other things, violations of EMTALA. Specifically, Plaintiffs allege: (1) failure to comply with EMTALA's medical screening requirement; and (2) failure to comply with EMTALA's stabilization requirement. Defendant Star Valley has moved for partial summary judgment on these EMTALA claims.

### Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to in-

terrogatories, and admissions on file, together with the affidavits, if any, show that there are no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court views the evidence in the light most favorable to the party opposing summary judgment. *Jenkins v. Wood,* 81 F.3d 988, 990 (10th Cir. 1996).

The party moving for summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the nonmoving party's claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to establish the existence of an essential element of the claims on which it bears the burden of proof at trial. *Id.* "While the movant bears the burden of showing the absence of a genuine issue of material fact, the movant need not negate the nonmovant's claim." *Jenkins,* 81 F.3d at 990.

To satisfy this burden, the nonmoving party must go beyond the pleadings and designate specific facts to make a showing that there is a genuine issue for trial. *Ford v. West,* 222 F.3d 767, 774 (10th Cir.2000). In order to successfully resist summary judgment, there must be sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Furthermore, a "mere . . . scintilla of evidence in support of the nonmovant's position is insufficient to create a dispute of fact that is 'genuine'; an issue of material fact is genuine only if the nonmovant presents facts such that a reasonable jury could find in favor of the nonmovant." *Lawmaster v. Ward,* 125 F.3d 1341, 1347 (10th Cir.1997).

### Analysis

#### I. EMTALA Standards

##### A. Purpose of EMTALA

 Congress's purpose in enacting EMTALA was to prevent "dumping" treatable patients who cannot pay for services. *Delaney v. Cade,* 986 F.2d 387, 391 n. 5 (10th Cir.1993); *Abercrombie v. Osteopathic Hosp. Founders Ass'n,* 950 F.2d 676, 680 (10th Cir.1991). EMTALA was designed specifically to address this societal concern, not to function as a federal malpractice statute. *See Repp,* 43 F.3d at 522. Congress did not intend for EMTALA to create a negligence standard, and EMTALA is not a substitute for state law medical malpractice suits. *Baber v. Hosp. Corp. of Am.,* 977 F.2d 872, 880 (4th Cir. 1992), *Bryan v. Rectors & Visitors of the Univ. of Va.,* 95 F.3d 349, 350–52 (4th Cir.1996).

##### B. The Medical Screening Requirement

 Under the EMTALA medical screening requirement, with respect to any individual who comes to the emergency department of a hospital:

> [I]f . . . a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . . exists.

42 U.S.C. § 1395dd(a). A high level of deference is shown to the hospital in determining its own capabilities. For purposes of EMTALA, "[a] court should ask only whether the hospital adhered to its own procedures, not whether the procedures were adequate if followed." *Repp v. Anadarko Mun. Hosp.,* 43 F.3d 519, 522 n. 4

(10th Cir.1994). Based on the hospital's pre-existing procedures, EMTALA's screening requirement is violated "when [the hospital] does not follow its own standard procedures." *See id.* at 522.

■ An "emergency medical condition" includes "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in" one or more of the following:

(i) placing the health of the individual . . . in serious jeopardy,

(ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part[.]

42 U.S.C. § 1395dd(e)(1)(A). As the statute explains, the purpose of the screening requirement is to determine whether such an emergency medical condition exists. 42 U.S.C. § 1395dd(a). However, section 1395dd(a) "is not intended to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances." *Collins v. DePaul Hosp.,* 963 F.2d 303, 307 (10th Cir.1992) (quoting *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir.1991)).

■ Furthermore, "a hospital does not violate EMTALA if it fails to detect or if it misdiagnoses an emergency condition." *Bryant v. Adventist Health Sys. /West,* 289 F.3d 1162, 1166 (9th Cir.2002). Therefore, the "appropriateness of the screening [is not to] be determined by its adequacy in identifying the patient's illness," *Holcomb v. Monahan,* 30 F.3d 116, 117 (11th Cir.1994), or by its accuracy in diagnosis. *Vickers v. Nash Gen. Hosp., Inc.,* 78 F.3d 139, 143 (4th Cir.1996). Rather, it is to be judged based on wheth-

er the hospital followed its own procedures. *See Repp,* 43 F.3d at 522.

### C. *Necessary Stabilizing Treatment for Emergency Medical Conditions*

If the hospital determines that an emergency medical condition exists, the hospital is required to provide stabilizing treatment before transferring the individual. 42 U.S.C. § 1395dd(b)(1). The term "stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395(e)(3)(A). A transfer includes discharge and movement to another facility. 42 U.S.C. § 1395(e)(4).

The *Holcomb* court set forth the requirements that must be established to succeed on a § 1395dd(b) stabilization requirement claim: (1) "the patient had an emergency medical condition"; (2) "the hospital knew of the condition"; (3) "the patient was not stabilized before being transferred"; and (4) "the hospital neither obtained the patient's consent to transfer nor completed a certificate indicating the transfer would be beneficial to the patient and was appropriate." 30 F.3d at 117.

■ A hospital has a duty to stabilize only those emergency conditions its staff detects. *Jackson v. E. Bay Hosp.,* 246 F.3d 1248, 1254–55 (9th Cir.2001). Therefore, "[i]f no emergency condition is detected, there is no duty to stabilize." *del Carmen Guadalupe v. Negron Agosto,* 299 F.3d 15, 23 (1st Cir.2002).

## II. *Application*

### A. *Purpose of EMTALA*

Star Valley points out that at the time of Emily Kilroy's presentation at the emer-

gency room, Dr. Carter had no understanding of whether or not there was insurance coverage, and he did not ask. Therefore, Star Valley argues that the purpose of EMTALA, to provide emergency medical care regardless of ability to pay, is not implicated in this case.

However, although EMTALA was originally intended to cure the evil of "dumping patients" who could not pay for services, the rights guaranteed under EMTALA apply equally to all individuals, whether or not they are insured. *See Collins,* 963 F.2d at 308 (stating that EMTALA also applies to those who are covered by health insurance); *see also Summers v. Baptist Med. Ctr. Arkadelphia,* 91 F.3d 1132, 1137 (8th Cir.1996) (en banc) (stating that the statute literally applies to "any individual," so the absence of indigence or uninsured status does not defeat an EMTALA claim). Thus, Plaintiffs argue that neither the Kilroys' ability or inability to pay, nor Dr. Carter's lack of knowledge regarding their ability or inability to pay, is dispositive for their EMTALA claims.

The Tenth Circuit has made clear that "a hospital's obligation under EMTALA is measured by whether it treats every patient perceived to have the same medical condition in the same manner." *Phillips v. Hillcrest Med. Ctr.,* 244 F.3d 790, 797 (10th Cir.2001). Plaintiffs contend that the hospital's standard procedures were not followed in this case and that, as a result, Emily Kilroy was not treated in the same manner as others with the same condition.

**B.** *The Medical Screening Requirement*

■ Star Valley argues that Plaintiffs ignore the important distinction between an EMTALA claim and a malpractice claim—faulty screening does not contravene EMTALA. Plaintiffs' criticisms of Dr. Carter's diagnosis of Emily Kilroy are indistinguishable from the standard of care in a malpractice case based on a misdiagnosis. Star Valley contends that under EMTALA, the issue is whether the procedures followed in the emergency room, even if they resulted in a misdiagnosis, were reasonably calculated to identify whether the patient had an emergency medical condition. The question is "whether the hospital adhered to its own procedures, not whether the procedures were adequate if followed." *Repp,* 43 F.3d at 522 & n. 4.

Plaintiffs do not dispute Star Valley's characterization of the law but contend that Star Valley did not comply with its own policies and procedures. First, the health care providers did not provide full documentation as required by Star Valley's EMTALA policy for medical screening examinations. (Pls.' Opp'n to Partial Summ. J., Exh. C, at p. 4).[2] Emily Kilroy's vital signs were measured only at her presentation to the emergency room, despite Star Valley's policy requiring health care providers to reassess emergency patients' status periodically, and certainly prior to discharge. Furthermore, there was no note on the emergency room record about the specific condition of Emily upon discharge as required by Star Valley's "Emergency Room Discharge Policy." (Pls.' Opp'n to

---

**2.** This policy states in part:

Star Valley Medical Center will document in the patient's medical record to reflect continued monitoring according to the patient's needs. The continued monitoring will continue until the patient is stabilized or appropriately transferred. At a minimum, documentation will be performed upon presentation, throughout the emergency department visit as warranted by patient condition, and upon discharge or transfer.

Partial Summ. J., Exh. D). Likewise, certain provisions of the "Policy and Procedure for Nebulizer Therapy Without Positive Pressure," (Pls.' Opp'n to Partial Summ. J., Exh. E), were not followed. The policy requires patients receiving the therapy treatment to have a heart rate obtained both before and after the treatment. Emily's heart rate was obtained and recorded only before the treatment. The last step of this procedure is to record medication used, patient's respiratory rate and effort, and description of secretions. Emily's respiratory rate and effort after nebulizer treatment were not recorded anywhere in her chart, and Dr. Carter could not recall whether he measured her respiratory rate. Therefore, Plaintiffs argue, there are genuine issues of material fact as to whether Star Valley followed its own screening procedures.

■■■ The Court finds that Star Valley's compliance with its own screening procedures was adequate under EMTALA. The Tenth Circuit has stated, "EMTALA's beneficent purpose should not obscure its inherent limitations. Section 1395dd is an anti-dumping provision, not a federal malpractice law." *St. Anthony Hosp. v. United States Dept. of Health and Human Servs.*, 309 F.3d 680, 694 (10th Cir.2002). "Its core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat." *Id.* (quoting *Bryan*, 95 F.3d at 351). Therefore, the Court will not view simply any oversight in procedure to be a violation of EMTALA. The deviation from the procedure must be substantial enough to actually implicate EMTALA's policy. A screening that is "so cursory" that it is "not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury" would violate EMTALA. *Bryant*, 289 F.3d at 1166 n. 3.

However, this is not the case here. Viewed in the light most favorable to Plaintiffs, Star Valley's recording procedures were not thoroughly followed as written. However, the variations from standard procedure were minor and did not rise to the level of being "so cursory" so as to fail to alert the physician of the need for medical attention. The procedures Dr. Carter and the nurse followed were designed to diagnose Emily's medical condition. Dr. Carter made diagnoses for which he provided treatment; he prescribed drugs and gave Randy Kilroy instructions to monitor his daughter and bring her back if her condition deteriorated. Whether he failed to appreciate the gravity of Emily's condition is a question to be addressed on Plaintiffs' malpractice claim. These facts, however, do not show that Emily was a victim of patient "dumping" or disparate treatment.

### C. The Stabilization Requirement

■■ EMTALA requires stabilization only for those patients evaluated as having "emergency medical conditions" after the medical screening examination. Under the Eleventh Circuit's *Holcomb* test, which this Court finds persuasive, an EMTALA stabilization requirement claim requires, among other things, that the patient have had an emergency medical condition and that the hospital have known of that condition. Even if Emily Kilroy's condition qualified as an emergency medical condition, Star Valley did not detect that condition. Therefore, Star Valley contends, it could not have violated the stabilization requirement, because the requirement was never implicated.

Plaintiff responds that there is evidence in the record which supports a finding that Dr. Carter and the hospital were aware that Emily had several emergency medical conditions. For example, in his deposition,

Dr. Carter agreed that he evaluated the dysfunction of Emily's lungs and ears as serious but not life-threatening. (Pls.' Opp'n to Partial Summ. J., Exh. B, at p. 142). Dr. Carter also testified that Emily had respiratory distress "to a degree" in the emergency room. (Pls.' Opp'n to Partial Summ. J., Exh. B, at pp. 114–15). Dr. Carter has stated that a normal respiratory rate in a child Emily's age is around twenty breaths per minute. Furthermore, according to the deposition of Marcia Bahr, a staff nurse at Star Valley, "Dr. Carter is famous for telling us if their respiratory rate is over the speed limit, it's a danger sign.... In other words, over 55." (Pls.' Opp'n to Partial Summ. J., Exh. F, at p. 43).

Emily's charted respiratory rate at the time of reporting was 56, a fact which Plaintiffs contend must have put Dr. Carter on notice of the severity of Emily's condition. Furthermore, one of Plaintiffs' experts, Dr. David Driggers, a board-certified family practice physician like Dr. Carter, opined in his affidavit that Emily had an emergency medical condition when she was brought to Star Valley's emergency department. (Pls.' Opp'n to Partial Summ. J., Exh. G). Therefore, Plaintiffs assert that there are genuine issues of material fact as to whether Star Valley was aware of Emily's emergency medical condition.

The Court believes that Plaintiffs' evidence of the apparent nature of Emily Kilroy's emergency medical condition is only relevant for their medical malpractice claim. Under that claim, Plaintiffs may argue that any reasonable and prudent physician would have known that Emily had an emergency medical condition, given the circumstances. However, this reasonableness standard does not apply in determining the EMTALA question whether the hospital actually detected an emergency medical condition (i.e., whether Dr. Carter "must have known" about her con-

dition). *See Bryant*, 289 F.3d at 1166 (rejecting the plaintiffs' arguments that " § 1395dd(b)(1) should be read to include a reasonableness standard in determining whether a hospital has detected an emergency medical condition"). In *Bryant*, the court held that an expert's opinion that a doctor should have known that the patient had a lung abscess was relevant to a malpractice claim, but not to an EMTALA claim. *Id.*

The Court has encountered no authority to contradict the notion that the determination of an emergency medical condition is an official one: the hospital either affirms or denies the presence of such a condition. This idea is supported by *Bryant*, in which the court explained that "[o]ur prior cases address Plaintiffs' concern that a hospital will intentionally fail to diagnose an emergency medical condition in order to avoid EMTALA's stabilization claim." *Id.* at 1166 n. 3. In such a case, "a hospital may be found liable under EMTALA's screening provision if the screening examination is so cursory that it is not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury." *Id.* (internal quotation marks and citation omitted). Therefore, even if a hospital intentionally overlooks signs of an emergency medical condition, the stabilization requirement still does not become operative.

In this case, the hospital made no official determination that an emergency medical condition existed. Whether Dr. Carter was reasonable and prudent in his judgment is a matter that the jury may decide under the negligence standard of the medical malpractice claim. Plaintiffs may not, however, use evidence of Dr. Carter's poor medical judgment in this particular instance to save their EMTALA stabilization claim; hence, because Dr. Carter deter-

mined after screening that no emergency medical condition existed, Star Valley never had a duty to stabilize under EMTALA.

### Conclusion

For the aforementioned reasons, Defendant Star Valley's Motion for Partial Summary Judgment on Plaintiffs' Emergency Medical Treatment and Active Labor Act claims is **GRANTED**.