# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 1, 2011

No. 09-20780

Lyle W. Cayce
Clerk

WENDY GUZMAN, individually and as next friend of TG a minor;
DOMINIC GUZMAN, individually and as next friend of TG a minor,

Plaintiffs-Appellants

v.

MEMORIAL HERMANN HOSPITAL SYSTEM, doing business as Memorial
Hermann Southeast Hospital,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 04:07-CV-3973

Before HIGGINBOTHAM, CLEMENT, and OWEN, Circuit Judges.

PER CURIAM:[*]

Wendy and Dominic Guzman ("Guzmans") sued Memorial Hermann
Southeast Hospital ("Memorial") on behalf of their son, "T", alleging that
Memorial had violated the Emergency Medical Treatment and Active Labor Act
(EMTALA), 42 U.S.C. § 1395dd. The district court granted summary judgment
in Memorial's favor, holding that Memorial had fulfilled its obligation under

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 09-20780

EMTALA to screen T for an emergency medical condition. The Guzmans appeal, and we **AFFIRM**.

## I.     FACTS AND PROCEEDINGS

On February 12, 2006, the Guzmans' seven-year-old son T was feeling ill. The Guzmans took T to the emergency room at Memorial in Houston, Texas.

There are three Memorial documents relevant to this appeal. At the time, Memorial maintained a document titled "Medical Screening Criteria" (MSC) that described a process for medical screening examinations. The MSC stated that "all patients presenting to the emergency department must have a medical screening exam." The MSC set out "a guideline for medical screening by qualified non-physician medical personnel," but did not describe different protocols or procedures based on symptoms. Under the policy, non-physician personnel assessed the patient's: (1) chief complaint; (2) history; (3) vital signs; (4) mental status; (5) skin; (6) ability to walk; and (7) general appearance. They were also required under the policy to perform a focused exam on the organ system related to the patient's chief complaint. The policy set out a series of criteria for determining if a patient did *not* have an emergency condition. Patients that were not "screened out"—*i.e.* patients that did not meet the criteria—were sent to a physician for examination because they had or potentially had an emergency condition.

Memorial also maintained a document titled "Emergency Center Triage Guidelines" (Triage Guidelines). The Triage Guidelines were a standard set of instructions developed to assist in expediting patient flow by allowing hospital staff to order medical tests when a patient could not immediately see a physician. Under the category "Vomiting/Diarrhea: Pediatric (2 Months to 18 Yr)," the Triage Guidelines called for a complete blood count (CBC) if the child appeared significantly dehydrated and a urinanalysis if the child had vomited more than twice or if urinary tract infection (UTI) symptoms were present.

Finally, Memorial also maintained emergency department nursing guidelines (Nursing Guidelines), which required nursing staff to check a patient's vitals within one hour of the patient's discharge.

At 7:39 a.m., T arrived at Memorial's emergency room and was taken to the triage area. A nurse took T's vitals signs and recorded that T had a temperature of 98.1 degrees, blood pressure of 110/67, and a heart rate of 145 beats per minute. Because T's heart rate was higher than normal, the nurse classified T as potentially having an emergency condition and placed him in a room to be seen by a doctor.

At 8:00 a.m., Dr. Phillip Haynes took T's medical history and performed a physical examination of T. During the examination, Wendy Guzman told Haynes that T had vomited eight times the previous night. Haynes then ordered several lab tests, including a CBC. Included in a CBC is a white blood cell differential test, which examines, classifies, and counts white blood cells. One type of white blood cell counted in the differential test is the immature neutrophil, or "band." A high band count indicates that a patient is fighting off an infection.

The automated lab device performing T's white blood cell differential test generated an abnormality flag, and as a result, Memorial staff performed a manual white blood cell differential test. T's manual white blood cell differential results (Differential Results) indicated that he had a band count over five times the normal range. The full CBC test results were available on the hospital computers at 9:35 a.m.

At 9:58 a.m., a nurse recorded T's heart rate, which had decreased to 105-110 beats per minute. At approximately 10:00 a.m., Haynes reviewed the results of the CBC but, according to his deposition testimony, the Differential Results were not on the screen. At 10:13 a.m., Haynes diagnosed T with viral syndrome. When filling out T's diagnosis sheet, Haynes circled UTI; Haynes

3

No. 09-20780

later testified that this was a mistake and that he did not consider T's symptoms to be consistent with an urinary tract infection. At 10:15 a.m., T was discharged from the hospital. Haynes did not read T's the Differential Results before discharging him.

The Guzmans took T home, but T's condition worsened overnight. The Guzmans brought T back to Memorial's emergency room the next morning, where the physician examining T suspected that he had sepsis, an inflammatory process that develops in response to an infection and spreads throughout the body. T was eventually airlifted to another hospital where he was later diagnosed with septic shock, which caused organ injury. Although T's condition has improved, he still requires follow-up medical care and therapy.

The Guzmans filed this lawsuit, individually and on behalf of their son, against Memorial in Texas state court. Memorial removed the case to federal district court and later moved for summary judgment on the Guzman's EMTALA claims. The Guzmans opposed the motion and moved for a continuance in order to conduct discovery under FEDERAL RULE OF CIVIL PROCEDURE 56(d).[1] In a comprehensive and lengthy memorandum and opinion, the district court denied the Guzmans' motion for a continuance and granted Memorial's motion for partial summary judgment. *Guzman v. Mem'l Hermann Hosp. Sys.*, 637 F. Supp. 2d 464, 520 (S.D. Tex. 2009).

## II.   STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*. *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to

---

[1] The Guzmans filed a motion for continuance under former Federal Rule of Civil Procedure 56(f). Rule 56 was amended effective December 1, 2010, and "[s]ubdivision (d) carries forward without substantial change the provisions of former subdivision (f)." *See* FED. R. CIV. P. 56 advisory committee's note.

any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We view all evidence and make all reasonable inferences in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation marks and citation omitted).

We review the denial of a Rule 56(d) motion for abuse of discretion. *See Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 534 (5th Cir. 1999). Rule 56(d) motions are generally favored and should be liberally granted, but to justify the continuance the movant must demonstrate: (1) why she needs additional discovery and (2) how the additional discovery will likely create a genuine issue of material fact. *See id*. at 534-35.

## III.   DISCUSSION

### A.   EMTALA

Congress enacted EMTALA "to prevent 'patient dumping,' which is the practice of refusing to treat patients who are unable to pay." *Battle v. Mem'l Hosp. at Gulfport*, 228 F.3d 544, 557 (5th Cir. 2000) (quoting *Marshall v. E. Carrol Parish Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998) (internal quotation marks omitted)). "The act requires that participating hospitals give the following care to an individual who is presented for emergency medical care: (1) an appropriate medical screening; (2) stabilization of a known emergency medical condition; and (3) restrictions on transfer of an unstabilized individual to another medical facility." *Id*. (citing 42 U.S.C. § 1395dd(a)-(c)). The act provides patients with a private cause of action for any personal harm a patient suffers as a direct result of the hospital's EMTALA violation. 42 U.S.C. § 1395dd(d)(2)(A).

This appeal concerns EMTALA's screening requirement. EMTALA does not define what is an "appropriate screening examination," but this circuit and others have held that it is "a screening examination that the hospital would have offered to any other patient in a similar condition with similar symptoms."

No. 09-20780

*Marshall*, 134 F.3d at 323; *see also, e.g.*, *Summers v. Baptist Med. Ctr. Arkdelphia*, 91 F.3d 1132, 1138 (4th Cir. 1996).  Thus, "[a]n inappropriate screening examination is one that has a disparate impact on the plaintiff." *Summers*, 91 F.3d at 1138.  A patient can prove disparate impact by showing that the hospital did not follow its own standard screening procedures or by pointing to differences between the screening examination that the patient received and examinations that other patients with similar symptoms received at the same hospital.  *See Battle*, 228 F.3d at 558 (noting that patient attempted to prove disparate impact by showing that he was screened differently and by showing that the hospital did not follow its screening procedures).  A patient can also prove an EMTALA violation by showing that the hospital provided such a cursory screening that it amounted to no screening at all.  *Correa v. Hosp. S.F.*, 69 F.3d 1184, 1192-93 (1st Cir. 1995).

      B.    Whether the District Court Properly Granted Summary Judgment on the Guzmans' Claims Under EMTALA.

The Guzmans argued before the district court, among other things,[2] that Memorial failed to provide T with an "appropriate medical screening examination" required under EMTALA because: (1) Haynes failed to read the Differential Results; (2) Memorial staff failed to order a urinalysis for T; and (3) Memorial staff failed to take and record T's vital signs within one hour of his discharge. On appeal, the Guzmans argue that the district court improperly granted summary judgment on all three of their EMTALA screening claims.

      1.    The Guzmans' Differential Results EMTALA Claim

---

[2] The Guzmans also argued that Memorial had failed to stabilize and appropriately transfer T to a different hospital, as required by EMTALA.  The district court granted summary judgment on these claims.  *Guzman*, 637 F. Supp. 2d at 502-18.  The Guzmans do not appeal the district court's rulings on these claims.

No. 09-20780

a.   Whether the Guzmans Raised a Genuine Issue of
Material Fact on Their Claim that Memorial Did Not
Follow Its Screening Policy.

The Guzmans argue that they raised a genuine issue of material fact as
to whether Memorial violated EMTALA by failing to follow a symptom-specific
screening policy, namely the Triage Guidelines, in screening T. They argue that
the Triage Guidelines required Haynes to order a CBC for T and to read the full
CBC results, including the Differential Results.

As the district court noted, the Guzmans' argument fails because they did
not raise a genuine issue of material fact on whether Memorial failed to follow
the Triage Guidelines in screening T. *Guzman,* 637 F. Supp. 2d at 490. The
Triage Guidelines stated that they were "meant to assist in patient flow" by
assisting "staff in ordering appropriate studies [to] . . . expedite[] evaluation by
the physician." The Triage Guidelines also state that "[t]he patient is to be
brought directly to a room if one is available" and that "[t]hey are not intended
to delay physician evaluation." The Triage Guidelines were clearly intended to
allow a nurse to initiate testing before a physician's examination; they did not
apply when a patient saw a doctor promptly and did not specify specific steps for
the doctor to follow when he or she saw a patient. T was undisputably able to
see a doctor promptly: he saw Haynes twenty minutes after he arrived in the
emergency room. Even if we accept the Guzmans' argument that the Triage
Guidelines were part of Memorial's screening policy, Memorial could not have
violated the Triage Guidelines because they did not apply to T.[3] *Cf. Fraticelli-
Torres v. Hosp. Hermanos*, 300 F. App'x. 1, 3 (1st Cir. 2008) (holding that

---

[3] The Guzmans cite to this court's decision in *Battle* to support their argument that
Memorial violated EMTALA by failing to follow the Triage Guidelines in screening T. But, as
the district court noted, *Battle* is distinguishable. *Guzman*, 637 F. Supp. 2d at 489. It was not
clear in *Battle* if the policy in question ceased to be relevant once a patient saw a physician.
*Id.* In contrast, the Triage Guidelines, by their own terms, did not apply to Haynes's screening
of T.

hospital did not violate EMTALA by failing to follow a thrombolysis protocol because "by its very terms, [the protocol was] not expressly applicable to patients in [the] ER."). The Guzmans did not raise a genuine issue of material fact on whether Memorial violated EMTALA by failing to follow its screening policy.

> b. Whether the Guzmans Raised a Genuine Issue of Material Fact on Their Claim that T Was Screened Differently From Other Patients With Similar Symptoms.

The Guzmans also argue that they raised a question of material fact as to whether T was screened differently from other patients because Haynes failed to read the Differential Results. They argue that: (1) the Triage Guidelines allow nurses to order a CBC for patients; (2) Haynes ordered the CBC; and (3) Haynes testified that it was his routine to review all the lab tests available to him. According to the Guzmans, these facts indicate that ordering and reviewing all the results of an ordered CBC are part of Memorial's usual procedures. [4] Relying on *Power v. Arlington Hospital Assoc.*, 42 F.3d 851 (4th Cir. 1994), they argue that deviations from the standard of care during a physician's screening examination can be evidence of disparate treatment. In *Power*, the Fourth Circuit affirmed an EMTALA verdict where the plaintiff presented evidence that the doctor deviated from the hospital's usual procedures when he discharged the patient before the results of her urinanalysis were returned. *Id.* at 855, 859.

The Guzmans have not raised a genuine issue of material fact on whether T was screened differently from other patients. Unlike the situation in *Power,* the Guzmans presented no evidence that it was Memorial's policy that

---

[4] The Guzmans also argue that the district court erred in holding that there was no overlap between an appropriate screening examination and medical negligence. They misread the court's holding. The court held that T's screening was not an EMTALA violation and that the Guzmans still had recourse in a negligence lawsuit. *Guzman*, 637 F. Supp. 2d at 520. It did not hold that negligence liability precludes EMTALA liability.

physicians would not discharge patients with symptoms like T's until after the physician read all the results of ordered tests. The Triage Guidelines do not raise a question of material fact on this issue because they only require a physician to review lab results "[i]n the event that a patient leaves prior to evaluation." They do not indicate or require that a physician review all test results before discharging a patient.

The fact that Haynes ordered the CBC and testified that it was his routine to review all available test results also does not raise a question of material fact. "The testimony of one physician regarding his own standard procedures is not sufficient to establish the standard practices of the entire hospital." *Bryant v. John D. Archbold Mem'l Hosp.*, 2006 WL 1517074, at *4-5 (M.D. Ga. May 23, 2006). Furthermore, Haynes explicitly testified that he did not routinely wait for white blood cell differential test results before discharging patients. The Guzmans have failed to raise a genuine issue of material fact as to whether T was screened differently from other patients.

2.     The Guzmans' Urinanalysis EMTALA Claim

The Guzmans' next EMTALA claim alleges that Memorial disparately screened T by failing to order a urinanalysis for T even though Haynes circled "UTI" on T's diagnosis.[5] We need not address the question of whether Memorial screened T differently from other patients by not ordering an urinanalysis because the Guzmans did not raise a question of material fact on whether T was directly harmed by Haynes's failure to order the test. The Guzmans presented no evidence that a urinanlysis would have enabled Dr. Haynes to correctly diagnose T's condition or otherwise prevent T's condition from worsening. The district court properly granted summary judgment on this claim.

---

[5] The Guzmans also argue that the Triage Guidelines required Haynes to order a urinanalysis. But, as discussed above, the Triage Guidelines did not apply to T because he saw Haynes immediately after being screened-in.

No. 09-20780

### 3.    The Guzmans' Vital Signs EMTALA Claim

The Guzmans argue that Memorial violated EMTALA when its hospital staff failed to take a full set of T's vital signs within one hour of his discharge, as required by the Nursing Guidelines.  Memorial undisputedly took all of T's vitals when he was admitted into the emergency room, two-and-one-half hours before he was discharged.  He was classified as emergent because his heart rate was abnormally high.  At 9:48, less than one hour before T's discharge, nursing staff took his heart rate again.  At this time, T's heart rate was normal.  Nursing staff did not take T's other vital signs before he was discharged.  The district court below held that this was not an EMTALA violation.

We agree with the district court and hold that "with respect to the taking of vital signs, only a substantial deviation from a hospital's medical screening policy can violate EMTALA." *Guzman*, 647 F. Supp. 2d at 499; *see Kilroy v. Star Valley Med. Ctr.*, 237 F. Supp. 2d 1298, 1305 (D. Wyo. 2002) ("[T]he Court will not view simply any oversight in procedure to be a violation of EMTALA.  The deviation from the procedure must be substantial enough to actually implicate EMTALA's policy.").  In this case, Memorial took all of T's vital signs two-and-one-half hours before he was discharged.  It also recorded T's heart rate—the reason he was admitted as emergent—within one hour of his discharge.  The Guzmans have not presented any evidence that T's other vital signs, temperature and blood pressure, might have changed in the hour-and-one-half after they were first taken.  We conclude that, when viewed in context, Memorial effectively followed the Nursing Policy.  The district court properly granted summary judgment on this claim.

C.    Whether the District Court Abused Its Discretion in Denying the Guzmans' Rule 56(d) Motion.

After Memorial filed its motion for summary judgment, the Guzmans filed a Rule 56(d) motion for a continuance, arguing that they required the following

information to respond to Memorial's motion: (1) patient records from other emergency room patients with symptoms similar to T; (2) additional information about the Triage Guidelines; and (3) additional information regarding the "true nature" of Memorial's policies and procedures. They argue that the district court abused its discretion in denying their motion.

We hold that there was no abuse of discretion here. As stated above, the Triage Guidelines did not apply to patients like T who saw a physician immediately after being "screened in" at Memorial. The Guzmans' requested discovery on the Triage Guidelines, therefore, could not have raised a question of material fact. *See Stearns*, 170 F.3d at 534-35. They also fail to make any argument as to how information on the "true nature" of Memorial's policies would have raised a question of material fact.

With respect to the Guzmans' motion for a continuance in order to obtain discovery on records of other patients, the district court correctly noted that the discovery could not provide information creating a genuine issue of material fact. The Guzmans sought information that Memorial physicians always reviewed the results of white blood cell differential tests. But the Guzmans did not show that doctors routinely record on a patient's chart that they have read the result of a test. According to the record, Memorial medical charts indicate the time and ordering physician for a test, in addition to any pertinent lab values indicated by the doctors. Thus, the absence of a differential test result on a chart could either mean that the doctor failed to read the result or that the result was normal. Because the patient records did not have the information that the Guzmans sought, they could not have raised a genuine issue of material fact and the district court did not abuse its discretion in denying their motion for continuance.

No. 09-20780

## CONCLUSION

For the forgoing reasons, the district court's grant of summary judgment and denial of the Guzmans' Rule 56(d) motion are **AFFIRMED**.